IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RACHEL GNIEWKOWSKI,<br><br>      Plaintiff,<br><br>  v.<br><br>L'ANGE HAIR, INC.,<br><br>      Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Rachel Gniewkowski ("Plaintiff"), by and through undersigned counsel, seeks a permanent injunction requiring a change in L'Ange Hair, Inc.'s ("Defendant") corporate policies to cause its websites to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

## INTRODUCTION

1. In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[1]

---

[1] *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf)   (last accessed Oct. 2, 2018).

2.  Plaintiff is legally blind. She uses a screen reader to navigate the Internet.

3.  Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at *6-7.[2]

4.  Defendant is a retailer that sells various products direct to consumers, including hair care products, curling wands, flat irons, hair dryers, tool accessories, gift cards, and more.[3]

5.  Consumers may purchase Defendant's products at www.langehair.com and access Defendant's online support resources at www.support.langehair.com ("Websites"), websites Defendant owns, operates, and controls.[4]

---

[2] *See* American Federation for the Blind, *Screen Readers*, *available at* http://www.afb.org/prodBrowseCatResults.aspx?CatID=49 (last accessed Oct. 2, 2018) (discussing screen readers and how they work).

[3] L'Ange Hair, HomePage, *available at* https://langehair.com/ (last accessed Oct. 2, 2018).

[4] L'Ange Hair, Terms of Service, *available at* https://langehair.com/22041955/policies/35392715.html (last accessed Oct. 2, 2018) ("L'ANGE products and services are provided by L'ange Hair, Inc. These Terms of Service (the "Terms") are between you (the "customer", "you", "user", "your") and L'ange Hair, Inc. ("L'ANGE", "L'ange Hair Inc.", "we", "us", "our", "company"). These terms of use govern your access and use of all content and functionalities available at the L'ANGE website (the "Services").").

6.      Defendant's Websites allow consumers to research and purchase Defendant's products from the comfort and convenience of their own homes, arrange for home delivery, contact customer support, sign up for Defendant's "VIP Rewards" program, review important legal notices like Defendant's Privacy Policy and Terms of Service, and more.[5]

7.      Defendant is responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

8.      Unfortunately, Defendant denies approximately 8.1 million[6] Americans who have difficulty seeing access to its Websites' goods, content, and services because the Websites are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world.

9.      Plaintiff brings this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted

---

[5]      L'Ange Hair, HomePage, *available at* https://langehair.com/ (last accessed Oct. 2, 2018).
[6]      Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Oct. 2, 2018) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10.     By failing to make its Websites available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11.     Because Defendant's Websites are not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Websites to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

    a)   that Defendant retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist it in improving the accessibility of its Websites, including all third party content and plug-ins, so the goods and services on the Websites may be equally accessed and enjoyed by individuals with vision related disabilities;

    b)   that Defendant work with the Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

    c)   that Defendant work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

    d)   that Defendant work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

    e)   that Defendant incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f)   that Defendant work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Websites, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems;

g)   that Defendant directly link from the footer on each page of the Websites, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Websites to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Websites;

h)   that Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)   that Defendant provide a notice, prominently and directly linked from the footer on each page of the Websites, soliciting feedback from visitors to the Websites on how the accessibility of the Websites can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)   that Defendant provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites;

k)   that Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)   that Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites to be inaccessible to users of screen reader technology;

m)   that Plaintiff, her counsel and its experts monitor the Websites for up to two years after the Mutually Agreed Upon Consultant validates the Websites are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through her counsel and its experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

12.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

13.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14.     Defendant attempts to, and indeed does so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

15.     As described in additional detail below, Plaintiff was injured when she attempted to access Defendant's Websites from her home but encountered barriers that denied her full and equal access to Defendant's online goods, content, and services.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

17.     Plaintiff is and, at all times relevant hereto, has been a resident of Allegheny County, Pennsylvania. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

18.     Defendant is a California corporation with its principle place of business at 19867 Prairie St., #300, Chatsworth, CA 91311.

## FACTS APPLICABLE TO ALL CLAIMS

19.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

20.     Defendant's Websites allow consumers research and purchase Defendant's products from the comfort and convenience of their own homes, and arrange for home delivery.

21.     The Websites also enables consumers to contact Defendant's customer support, sign up for Defendant's "VIP Rewards" program, review important legal notices like Defendant's Privacy Policy and Terms of Service, and more.

22.     Consumers may use the Websites to connect with Defendant on social media, using sites like Facebook and Pinterest.

**HARM TO PLAINTIFF**

23.     Plaintiff attempted to access the Websites from her home in Allegheny County, Pennsylvania. Unfortunately, because of Defendant's failure to build its Websites in a matter that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Websites. For example,

(a)     Defendant's www.langehair.com website includes an adjustable, three-slide slideshow. Users who perceive content visually will note that each slide is represented by one of three dots, and that by scrolling from one dot to the next, users may access various information about the products Defendant sells, like Defendant's various travel-size products, products for men, and hair products. These users will also note that each slide includes a "Shop Now" button, and likely infer that by activating or "clicking" the slide, Defendant's website will redirect the user to another webpage to purchase the products each slide represents. Unfortunately, these slides lack alternative text to describe their content in sufficient detail. As a result, Defendant denies Plaintiff the opportunity to shop its website with any degree of confidence, which in turn makes Plaintiff more likely to abandon the online shopping process because of the access barriers she encounters and knows to exist.

(b)     Defendant provides a Product Reviews webpage on its www.langehair.com website where consumers can share their opinions of and personal experiences using Defendant's products. Users who perceive content visually will see that each review includes the reviewer's five-star rating and an opportunity to vote whether a review was helpful or not. To mark a review as helpful, consumers must click a "thumbs up" button; they can click a "thumbs down" button to mark a review as unhelpful. Unfortunately, the website fails to provide alternative text describing

the star and thumb icons. As a result, Plaintiff cannot distinguish a one-star rating from a five-star rating, undermining her efforts to be an informed consumer.

        (c)     After consumers add a product to their shopping cart, Defendant's www.langehair.com website displays a pop-up window. Users who perceive content visually will note that the pop-up window requires that they select from one of two buttons, including "CHECKOUT" and "CONTINUE SHOPPING." Unfortunately, Plaintiff's screen reader cannot access this pop-up window. As a result, she cannot make the mandatory selection and is blocked from completing the purchase process entirely.

24.    These barriers, and others, deny Plaintiff full and equal access to all of the services the Websites offer, and now deter her from attempting to use the Websites. Still, Plaintiff would like to, and intends to, attempt to access the Websites in the future to research the products and services the Websites offer, or to test the Websites for compliance with the ADA.

25.    If the Websites were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiff could independently research and purchase Defendant's products and access its other online content and services.

26.    Though Defendant may have centralized policies regarding the maintenance and operation of its Websites, Defendant has never had a plan or policy that is reasonably calculated to make its Websites fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

27.    The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

28.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS**

29.     Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

30.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

31.     There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

32.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

33.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

34.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Websites, and (b) whether Plaintiff can access the content and services.

## SUBSTANTIVE VIOLATIONS

## COUNT I

## Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

35.     The assertions contained in the previous paragraphs are incorporated by reference.

36.     Defendant's Websites are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

37.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Websites, it has violated the ADA.

38.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

39.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

40.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

41.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

42.     By failing to provide its Websites' content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Websites;

(b)     affording individuals with visual disabilities access to its Websites that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

43.     Defendant has violated Title III by, without limitation, failing to make its Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

44.     Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

45.     Making its online goods, content, and services compatible with screen reader programs does not change the content of Defendant's Websites or result in making the Websites different, but rather enables individuals with visual disabilities to access the Websites Defendant already provides.

46.     Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

47.     Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

48.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff request relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably

calculated to ensure that its Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Websites into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 11 above;

(C)     Payment of actual, statutory, and punitive damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(F)     The provision of whatever other relief the Court deems just, equitable and appropriate; and

14

(G)     An Order retaining jurisdiction over this case until Defendant has complied with

the Court's Orders.

Dated: November 7, 2018                    Respectfully Submitted,

*/s/ Benjamin J. Sweet*
Benjamin J. Sweet
bsweet@carlsonlynch.com
Kevin W. Tucker
ktucker@carlsonlynch.com
**CARLSON LYNCH SWEET KILPELA
& CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322.9243

*Counsel for Plaintiff*